**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DEBRA WARE,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:11-CV-1133-P-BK** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

This case has been referred to the undersigned for Findings, Conclusions, and Recommendation. The cause is now before the Court on Plaintiff's *Motion for Summary Judgment* (Doc. 21) and Defendant's *Motion for Summary Judgment* (Doc. 23). For the reasons set forth herein, it is recommended that Defendant's *Motion for Summary Judgment* be **GRANTED**, Plaintiff's *Motion for Summary Judgment* be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

## I. BACKGROUND[1]

### A. Procedural History

Plaintiff seeks judicial review of a final decision by the Commissioner denying her claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). In February 2008, Plaintiff filed for SSI and DIB, claiming disability since September 1992. (Tr. 130-45). Her application was denied at all administrative

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

levels, and she now appeals to this Court pursuant to 42 U.S.C. § 405(g). (Tr. 1-3, 18-31, 67-76, 81-88).

**B. Factual Background**

At the time of her application, Plaintiff was 26 years old, with a high school education from a special education program and some college training in job skills. (Tr. 37-38, 48-49, 171). She had previous work experience as a dietary aide in a nursing home and at a fast food restaurant. (Tr. 40-41, 343 ).

An evaluation by Dr. M.A. Cardwell, Jr. in December 1992, when Plaintiff was ten years old, indicated that she had marked difficulty in fine motor coordination, visual motor integration, visual processing, visual memory, retrieval memory and general organization. (Tr. 227-28). Plaintiff was diagnosed with mixed specific developmental disorder and possible attention deficit disorder. (Tr. 228-29).

In 1995, Plaintiff underwent Intelligence Quotient ("IQ") testing and produced valid scores of 74 in Verbal IQ ("VIQ"), 71 in Performance IQ ("PIQ"), and a Full Scale IQ ("FSIQ") of 70. (Tr. 250). Dr. E. Vennecia Jackson commented that Plaintiff demonstrated superficial processing such that she could "learn a new skill or concept one day and then can't remember it a few days later." (Tr. 236). Plaintiff was also deficient in self-monitoring such that she failed to notice when she was making mistakes. (Tr. 236). Psychometric testing demonstrated weakness in information retention. (Tr. 237). Dr. Jackson stated that Plaintiff's problems in language and cognitive functioning were so pervasive that Plaintiff could not keep up with information or enhance her thinking ability. (Tr. 239-40). She further stated that Plaintiff would need hands-on, concrete learning experiences to comprehend concepts. (Tr. 241).

In 2001, Plaintiff was tested again and scored a VIQ of 76, a PIQ of 73, and an FSIQ of 74. (Tr. 257). Dr. Richard Hughes, Ph.D., noted that Plaintiff would only be able to learn through hands-on experiences, and Plaintiff complained that it took her "longer to comprehend stuff than anybody else." (Tr. 257-58). In 2002, when Plaintiff was 19 years old, she was referred to Steven Carter, a vocational rehabilitation counselor, at which time her academic skills were at a third to sixth grade level. (Tr. 260). Plaintiff's IQ scores at that time revealed an FSIQ of 78, a VIQ of 80, and a PIQ of 79. (Tr. 264). Carter applied the Occupational Aptitude Survey and Interest Schedule ("OASIS") to measure Plaintiff's general vocational aptitude which indicated, based on her scores, that she might be able to work with animals, do basic work with plants or in the mechanical or industrial field, or work in vending or passenger/attendant services. (Tr. 269). Carter opined that Plaintiff would need on-the-job training with the aid of a job coach in order to be successful, and her employment prognosis was "fair." (Tr. 261-62).

In April 2008, Plaintiff underwent a psychological evaluation with Dr. Grant Hellyer. (Tr. 276-77). She told Dr. Hellyer that she was babysitting her infant nephew full time, she could perform all activities relating to her personal hygiene, and she did all of the household cooking for her sister's family. (Tr. 276-77). Plaintiff also cleaned her bathroom, did laundry for the household, attended church regularly, and had passed the written test to obtain a driver's license while in high school. (Tr. 277). Dr. Hellyer noted that Plaintiff could count backwards from 20 correctly, could not repeat six or five digits forward, but could repeat four, her general knowledge was within the normal range, she could categorize different objects, her comprehension was normal, and she could recall three objects after five minutes. (Tr. 277). Dr. Hellyer opined that Plaintiff may suffer from post traumatic stress disorder, as the result of a

prior sexual assault, as well as borderline intellectual functioning. (Tr. 277).

That same month, state agency medical consultant Charles Lankford, Ph.D., opined that Plaintiff's mental retardation did not satisfy Listing 12.05 because her disability resulted in her activities of daily living being only mildly restricted, and her ability to maintain persistence, concentration, and pace was only moderately restricted. (Tr. 289). Dr. Lankford noted that Plaintiff's daily activities included writing poetry, exercising, socializing with friends, and talking on the phone, and she was able to recall the current president and correctly interpret a proverb. (Tr. 291).

August 2008 IQ testing resulted in the following scores: a VIQ of 72, a PIQ of 69, and an FSIQ of 68. The examining psychologist diagnosed Plaintiff with mild mental retardation. (Tr. 337-38). One month later, Dr. Gregg D'Angelo, Ph.D. evaluated Plaintiff's readiness to work and, although Plaintiff was interested in working, she was only able to learn one of eight word pairs after four repetitions. (Tr. 345). Plaintiff told Dr. D'Angelo that she had previously worked for a year as a daycare teacher but was terminated for using glitter on Christmas cards, worked at a fast food restaurant from 2002 to 2004 until she became pregnant, did not work from 2004 until 2007 because she was caring for her child, and worked from 2007 to 2009 at Goodwill but left when the business downsized. (Tr. 343). Plaintiff demonstrated at that time a VIQ of 80, a PIQ of 77, and an FSIQ of 77. (Tr. 349). While Dr. D'Angelo thought Plaintiff appeared capable of competitive employment in jobs that did not exceed her intellectual abilities, he opined that she should avoid any work that required rapid learning and processing of even relatively brief or uncomplicated verbal information and details, and that Plaintiff would likely benefit from a job coach and supported employment. (Tr. 346-47).

Plaintiff's last test results were obtained from examining psychologist Dr. George Mount in February 2009. (Tr. 370). Dr. Mount administered the *Vineland Adaptive Behavioral Scales, Second Edition* ("Vineland-II"), which measures the personal and social skills of people from birth through adulthood. (Tr. 373). Plaintiff's test resulted in scores of 64 in Communication, 68 in Daily Living Skills, 71 in Socialization, and 74 in Motor Skills, all of which were low scores for her age. (Tr. 373-75). This resulted in an Adaptive Composite score of 65, which represented her overall level of adaptive functioning. (Tr. 373-74). Dr. Mount diagnosed Plaintiff with mild mental retardation and completed two medical source statements, indicating that Plaintiff had marked limitations or extreme loss in her ability to (1) understand, (2) concentrate and carry out more than very short and simple instructions, (3) accept instructions and respond appropriately to criticism from her supervisors, (4) get along well with co-workers without distracting them or exhibiting behavior extremes, (5) adapt to changes in a routine work setting, (6) maintain social functioning, and (7) engage in activities of daily living. (Tr. 377-78, 380, 389).

**C. <u>Administrative Hearing Testimony</u>**

At the administrative hearing, a medical expert psychologist ("ME") testified that Plaintiff had borderline intellectual capacity, but had the residual functional capacity ("RFC") to do simple repetitive work that did not require academic skill or literacy, and she was better suited to jobs where she could be trained visually rather than through oral instructions. (Tr. 53-57). A vocational expert ("VE") testified that, given Plaintiff's RFC, learning disability, and need to learn how to perform jobs visually, Plaintiff could perform light, unskilled work that did not require literacy, such as fast food worker, general packager, housekeeper, inspection quality

control, and laundry inspector. (Tr. 58-62). The VE stated that being a fast food worker would require the claimant to be able to concentrate and stay on task for two hours at a time and do simple one or two-step tasks, such as bussing tables and sweeping floors. (Tr. 63).

**D. The ALJ's Findings**

In reviewing Plaintiff's claim, the ALJ found, at step one of the sequential evaluation process, that Plaintiff had not engaged in significant gainful activity since her alleged disability onset date of September 1992. (Tr. 24). At step two, the ALJ found that Plaintiff's borderline intellectual functioning and learning disorder were severe impairments. (Tr. 24). At step three, the ALJ found that Plaintiff's medically determinable impairments did not meet or equal Listing 12.05, governing mental retardation, noting that (1) Plaintiff's most recent IQ scores were in the mid-70s to 80, (2) she was only mildly restricted in activities of daily living and social functioning, and (3) she had only moderate difficulties with concentration, persistence, or pace, as evidenced by Dr. Hellyer's psychological evaluation. (Tr. 25).

The ALJ next determined that Plaintiff's impairments reduced her RFC to a full range of work at all exertional levels, limited to unskilled work not requiring literacy. (Tr. 28). At step four, the ALJ found that Plaintiff could perform her past relevant work as a fast food worker and as a stocker. (Tr. 29). Alternatively, at step five, the ALJ found that Plaintiff could perform a significant number of jobs in the national economy, specifically 90% of the unskilled light occupational base and 92% of the unskilled sedentary occupational base. (Tr. 30). Lastly, the ALJ noted that he had considered Dr. Mount's opinion, but concluded that his opinion was inconsistent with the medical evidence of record and information about Plaintiff's abilities, as well as internally inconsistent, given that Dr. Mount had diagnosed Plaintiff with only mild

mental retardation but had found her to have significantly greater limitations. (Tr. 29).

## II. APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled: (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an individual is capable of performing her past work, a finding of "not disabled" must be made; (5) if an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if any other work can be performed. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b-(f)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* If the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-

Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan*, 38 F.3d at 236; 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett*, 67 F.3d at 564. Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

## III. ARGUMENT AND ANALYSIS

### A. Whether the ALJ erred in finding that Plaintiff did not meet Listing 12.05(D)

Plaintiff argues that the ALJ erred in assessing her disability under Listing 12.05(D) because the ALJ implicitly found that she has a valid IQ score between 60 and 70, but erroneously concluded that Plaintiff did not have "marked" impairments in her activities of daily living as well as in concentration, persistence, and pace when other evidence of record, as proved by the Vineland-II test conducted by Dr. Mount, established those limitations. (Doc. 22 at 12-15).

Defendant responds that, while Plaintiff claims that the ALJ must use the lowest score in each IQ test in evaluating a claimant under Listing 12.05, the regulations are silent on which test to use when multiple tests have been given, but generally require consideration of longitudinal evidence. (Doc. 23 at 6-7). Defendant contends that a review of Plaintiff's IQ scores over time

indicates that her IQ is between 70 and 80, precluding her from meeting the requirements of Listing 12.05(D). *Id.* at 7. Moreover, Defendant argues, substantial evidence supports the ALJ's finding that Plaintiff had only mild restrictions in her activities of daily living, as opposed to the moderate or marked restrictions necessary to meet Listing 12.05(D). *Id.* at 7-8. Finally, Defendant maintains that the ALJ properly rejected Dr. Mount's findings, which conflicted with the other evidence in the record. *Id.* at 8-11. Plaintiff essentially reiterates her arguments in her reply brief. (Doc. 24 at 1-5).

Pursuant to Listing 12.05(D), to be deemed mentally retarded, a claimant must have a valid VIQ, PIQ, or FSIQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

Here, the ALJ first considered whether Plaintiff met Listing 12.05(B) or (C) and concluded that she did not, stating that "her recent IQ scores are in the mid-70s to 80." (Tr. 25). The ALJ then addressed Listing 12.05(D), noting that Plaintiff was only mildly restricted in activities of daily living and social functioning and had only moderate difficulties with concentration, persistence, or pace. (Tr. 25). As an initial matter, the undersigned is not convinced that the ALJ "implicitly found" Plaintiff's IQ scores to be between 60 and 70 as required to satisfy Listing 12.05(d), given his statement in the preceding paragraph that Plaintiff recently had scored in the mid-70s to 80.

In any event, substantial evidence supports the ALJ's determination that Plaintiff had

only mild restrictions in her activities of daily living, given that, as of April 2008, she was babysitting her infant nephew full time, could perform all activities relating to her personal hygiene, did all of the cooking for her sister's family, cleaned her bathroom, did laundry for the household, attended church regularly, and had passed the written test to obtain her driver's license. (Tr. 276-77). The record also supports the ALJ's finding that Plaintiff had only moderate restrictions in concentration, persistence, and pace at that time, because Plaintiff could count backwards from 20 correctly, repeat four digits, and categorize different objects, her general knowledge was within the normal range, her comprehension was normal, and she could recall three objects after five minutes. (Tr. 277). Although Plaintiff points to other factors and testing techniques that she believes the ALJ should have given more weight to, substantial evidence nevertheless supports his decision, and it is not within the Court's power to reweigh the evidence or substitute its own judgment for that of the Commissioner. *Greenspan*, 38 F.3d at 236. Further, the ALJ's failure to discuss each piece of evidence in the medical record does not warrant reversal. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (ruling that the ALJ does not need to specifically address all of the evidence that he rejected).

**B. Whether the ALJ erred in determining Plaintiff's RFC**

Plaintiff next argues that the ALJ failed to account for the additional limitations she has due to her mental disabilities, and his limitation of her RFC assessment simply to "functional illiteracy" was not sufficiently accurate. (Doc. 22 at 16-18). In particular, Plaintiff argues that the ALJ should have used the General Educational Development ("GED") assessment set forth in the Dictionary of Occupational Titles ("DOT"), which would have demonstrated that Plaintiff's abilities were narrower than the ALJ accounted for. *Id.* at 18-20. Additionally, Plaintiff

contends that because she has an IQ score between 60 and 69, SSR 85-16 requires that her mental RFC be limited by her need for "simple oral instructions" and "somewhat closer supervision" than is otherwise provided in competitive employment. *Id.* at 21-22. Finally, Plaintiff argues that the ALJ erred by not assigning any RFC limitations based on her learning disability, even though those limitations were proved by her OASIS test scores. *Id.* at 22-24.

Defendant responds that the ALJ was not required to discuss all of Plaintiff's abilities individually, and he adequately explained how the evidence supported his conclusions about Plaintiff's limitations and ability to perform sustained work activities. (Doc. 23 at 11-12). Defendant maintains that the ALJ discussed the objective medical evidence that supported his RFC assessment and noted that Dr. Lankford's functional assessment was consistent with Plaintiff's capacity to perform unskilled work. *Id.* Next, Defendant contends that the ALJ's findings included limitations for Plaintiff's severe intellectual impairment and learning disabilities insofar as the ALJ (1) recited the findings of Dr. Lankford's mental RFC assessment, which specifically addressed Plaintiff's learning disabilities, and (2) incorporated into his hypothetical question to the VE and his RFC assessment the limitations that Plaintiff was capable of only simple one or two-step tasks, with no detailed work, that she would be treated as illiterate academically for vocational purposes, and needed to learn visually due to her learning disability. *Id.* at 12-13, 16-17. Defendant additionally argues that the ALJ's RFC restriction to work "not requiring literacy" fully encompassed Plaintiff's functional limitations, as the regulations specifically define illiteracy as "the inability to read or write." *Id.* at 13. Finally, Defendant contends that the ALJ was not required to rely on the DOT regulations' job assessments because he properly relied on the VE's testimony instead. *Id.* at 18-19.

Plaintiff replies that remand is required because (1) the ALJ's limitation of Plaintiff to one or two-step tasks does not account for her limitations in pace; and (2) the ALJ's finding about Plaintiff's limitations in her ability to understand, remember, and carry out detailed instructions does not account for her frequent limitations in concentration, persistence, or pace. (Doc. 25 at 6-7) (citing *Kasarsky v. Barnhart*, 335 F.3d 539 (7th Cir. 2003)). Plaintiff also urges that courts have rejected the argument that an ALJ can account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question posed to the VE to simple, routine tasks or unskilled work. *Id.* at 7 (citing *Stewart v. Astrue*, 561 F.3d 679 (7th Cir. 2009)). Plaintiff concludes that Defendant's attempts to explain why she can do unskilled work presupposes that she can both learn and retain the information being taught, but she has repeatedly shown that she cannot. *Id.* at 8.

The RFC is an assessment, based on all of the relevant evidence, of a claimant's ability to do work on a sustained basis in an ordinary work setting despite her impairments. 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). RFC refers to the most that a claimant is able to do despite her physical and mental limitations. 20 C.F.R. § 404.1545(a). The RFC assessment must first identify the claimant's functional limitations and assess the claimant's work-related abilities on a function-by-function basis. SSR 96-8P, 1996 WL 374184, *1. After identifying such limitations, the ALJ then expresses the claimant's RFC. *Id.* The RFC is considered by the ALJ, along with the claimant's age, education and work experience, in determining whether the claimant can work. 20 C.F.R. § 404.1520(f). In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe. SSR 96-8p; 20 C.F.R. § 404.1523.

While SSR 96-8 did require the ALJ to consider all of Plaintiff's impairments on a function by function basis, the ALJ's RFC fully encompassed Plaintiff's mental disabilities and her learning disorder when the ALJ assessed her ability to work in an ordinary setting, based on Dr. Lankford's opinion and the ME's testimony, the latter of whom explicitly discussed Plaintiff's learning disorder. (Tr. 28); 20 C.F.R. § 404.1545(a). Moreover, the ALJ assigned limitations in Plaintiff's RFC based on her learning disability by reciting and adopting the more detailed findings of Dr. Lankford's mental RFC assessment, which constitutes substantial evidence. (Tr. 289-91); *Brown v. Astrue*, 2009 WL 64117, *4 (N.D. Tex. 2009) (Fitzwater, C.J.) (holding that an ALJ had sufficiently factored a claimant's limitation into the RFC assessment via adoption of the limitations specified in the state medical consultant's RFC assessment where the assessment considered the limitation and was not wholly conclusory); *Latham v. Astrue*, 2008 WL 4635396, *3 (N.D. Tex. 2008) (Kaplan, J.) (holding that an ALJ may rely on the function-by-function assessment made by the state medical consultant regarding a claimant's exertional limitations in determining a claimant's RFC, in lieu of requiring the ALJ to engage in an explicit function-by-function analysis in his decision).

Plaintiff's reliance on *Kasarsky* is misplaced. The ALJ in that case inconsistently found that the claimant had frequent deficiencies of concentration, persistence or pace, but asked the VE about a hypothetical individual who was "not precluded from understanding, remembering, and carrying out detailed instructions." 335 F.3d at 544; *see also Stewart*, 561 F.3d at 682 (ALJ's hypothetical question to VE did not mention claimant's moderate difficulties in maintaining concentration, persistence, and pace). No such inconsistency exists here where the VE listened to the ME's testimony regarding Plaintiff's limitations and resulting RFC and then

testified that Plaintiff, as a "visual rather than an auditory learner" due to her learning disability, inability to do detailed work, and functional illiteracy, would be able to undergo on-the-job, "hands on" training for such unskilled jobs as housekeeper and laundry inspector and could also do Plaintiff's previous job as a fast food worker. (Tr. 59-62). The VE also testified that Plaintiff's prior fast food job required her to be able to concentrate for two hours at a time and do simple one to two-step tasks, which accounts for the ALJ's finding that Plaintiff was moderately limited in concentration, persistence, and pace. (Tr. 63).

Addressing Plaintiff's next argument, she provides no legal support for her contention that the ALJ should have used the GED in the DOT as binding authority instead of the functional illiteracy limitation set forth in the SSA regulations, and the Court does not find her argument persuasive. *See* 20 C.F.R. §§ 404.1564(b)(1), 416.920(b)(1) (defining illiteracy as "the inability to read or write"). Further, Plaintiff's argument that SSR 85-16 and her IQ score of 60 to 69 require that her RFC include her need for "simple oral instructions" and close supervision fails because SSR 85-16 does not mandate such. The ruling simply provides that "an individual, in whom the *only* finding in intellectual testing is an IQ between 60 and 69, is ordinarily expected to be able to understand simple oral instructions and to be able to carry out these instructions under somewhat closer supervision than required of an individual with a higher IQ." 1985 WL 56855, *3 (emphasis added). Here, however, Plaintiff had a variety of IQ scores, and thus the "only" finding was not an IQ of between 60 and 69.

**C. Whether the ALJ erred by finding that Plaintiff could perform other work in the national economy** [2]

Plaintiff argues that the ALJ asked the VE a faulty hypothetical that did not include the additional limitations she faced, namely the GED factors set forth in the DOT and Plaintiff's need for a job coach or supported employment. (Doc. 22 at 30). Adding those limitations to the job titles and quantities found by the VE, Plaintiff contends that the number of jobs conceivably available to her significantly erodes and even eliminates some jobs.

Defendant responds that Plaintiff failed to cite to any legal authority requiring application of the GED factors to her RFC, and substantial evidence supports the ALJ's RFC assessment. (Doc. 23 at 20-23). Further, Defendant points out that the VE's discussion about Plaintiff's need for a job coach or supported employment was in response to a hypothetical question posed by Plaintiff's attorney, not the ALJ. *Id.* at 22.

As the undersigned previously noted regarding Plaintiff's second issue, she provided no legal support for her argument that the ALJ should have used the GED in the DOT as binding authority; thus, her argument fails here as well. Moreover, the ALJ never made any finding that Plaintiff needed a job coach or supported employment, nor did the VE, who merely defined what services a job coach generally provided in response to a question from Plaintiff's attorney. (Tr. 63-64). Accordingly, the ALJ's finding that Plaintiff could perform work available in the

[2] In the third issue listed in her brief, Plaintiff argues that the ALJ erred in finding at step four of the sequential analysis that she could perform her past relevant work. (Doc. 22 at 26-27). Because the undersigned concludes that the ALJ correctly determined at step five that Plaintiff can perform other work available in the national economy, any error committed by the ALJ at step four is harmless and need not be addressed. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (stating that "[p]rocedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected.")

national economy is supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's *Motion for Summary Judgment* (Doc. 21) should be **DENIED,** Defendant's *Motion for Summary Judgment* (Doc. 23) should be **GRANTED**, and the Commissioner's decision should be affirmed.

**SIGNED** on April 5, 2012.

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE